**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**William M. PERCIVAL, Carolyn Allen Percival, Randy L. Middleton, Defendants-Appellants.**

**Nos. 83–1398 to 83–1400.**

United States Court of Appeals, Seventh Circuit.

Argued Nov. 7, 1984.

Decided March 11, 1985.

Rehearing and Rehearing En Banc Denied April 30, 1985.

defense under the circumstances of this case.

Frances C. Hulin, Asst. U.S. Atty., Danville, Ill., for plaintiff-appellee.

Bernard L. Segal, San Francisco, Cal., Catherine H. Barbercheck, Lawrence E. Johnson & Assoc., Champaign, Ill., Craig L. Truman, Littleton Public Defender's Office, Littleton, Colo., for defendants-appellants.

Before FLAUM, Circuit Judge and PELL and WISDOM,[*] Senior Circuit Judges.

FLAUM, Circuit Judge.

Defendants-appellants William M. Percival, his wife Carolyn Allen Percival, and Randy L. Middleton were convicted under 21 U.S.C. §§ 841(a)(1) and 846, following a jury trial, for conspiring to distribute cocaine. The Percivals were given twelve-year sentences; Middleton got fourteen years. William Percival was also convicted of possession with intent to distribute marijuana and hashish, for which he was sentenced to five years imprisonment, to run concurrently with his sentence on the conspiracy count.

On appeal, defendants allege that the trial court erred in refusing to grant their motions for severance or to instruct the jury on multiple conspiracies because the evidence at trial showed multiple conspiracies rather than the single conspiracy charged in the indictment. Carolyn Percival argues that the evidence presented at trial was insufficient to support her conspiracy conviction. William Percival appeals his conviction for possession with intent to distribute marijuana and hashish on the ground that the drugs forming the basis of the conviction were seized in violation of the Fourth Amendment's ban against illegal searches and seizures. Defendant Middleton also argues that he was entitled to an evidentiary hearing on his motion to dismiss the indictment based on discrimination in the selection of grand and petit jurors in the Central District of Illinois.

For the reasons set forth below, we affirm the convictions.

## I. FACTS

### A. The Conspiracy

Viewing the facts in the light most favorable to the government, *see Glasser v. United States*, 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942), the following emerged at trial. Edward Gonzalez, who was not indicted in this case, was a major Florida-based cocaine importer. Gonzalez distributed cocaine to a national network of buyers, including defendant Randy Middleton of Denver, Colorado. In April or May of 1977, Middleton came to Gonzalez's hotel room in Miami, Florida. Middleton took about 500 grams of cocaine from Gonzalez and left the room. Soon thereafter, Middleton came back, told Gonzalez that he had sold the cocaine to some people, and turned over about $32,000. Middleton later returned with William Percival and Charles Yettke, both from the Champaign/Urbana, Illinois area. The four men then spent twenty to thirty minutes discussing the possibilities of future transactions in cocaine.

In June or July of 1977, Middleton and Gonzalez flew from New York to Indianapolis, Indiana, carrying one and one-half to two kilograms of cocaine. Percival met Middleton and Gonzalez at the airport and took them to Champaign, where they waited in a motel room while Percival sold the cocaine. Percival then paid them over $60,000 out of the proceeds.

In the fall of 1977, Gonzalez made five or six more trips to Illinois, always bringing at least two and one-half kilograms of cocaine at a price of $46,000 per kilogram. On one of these occasions, Yettke met Percival and Gonzalez in St. Joseph, Illinois (near Champaign) and paid them some money for cocaine that he had sold. On anoth-

[*] The Honorable John Minor Wisdom, Senior Circuit Judge for the United States Court of Appeals for the Fifth Circuit, is sitting by designation.

er occasion, Yettke and Percival went to Chicago to pick up cocaine from Gonzalez. The trips continued into 1978 and 1979, although at some point in 1978 Gonzalez started sending cocaine to his buyers through couriers rather than delivering it himself.

In May of 1978 Gonzalez drove from Florida to Denver, Colorado, carrying twenty-five kilograms of cocaine. Because neither Gonzalez nor any of his couriers was able to deliver cocaine to Percival in Illinois at that time, Percival, Carolyn Percival, and Yettke travelled to Denver in a rented mobile home to get some of the cocaine. Upon arriving in Denver, the Percivals and Yettke checked into separate motel rooms. Shortly thereafter, Percival and Middleton brought some cocaine to Yettke's motel room, where it was hidden until the return trip to Champaign.

During Christmas of either 1977 or 1978, the Percivals hosted a gathering at their home in Champaign at which Middleton and Yettke were also present with their wives. The evidence does not reflect whether this gathering was social or business-related.

One of the couriers who delivered cocaine for Gonzalez, Harold Slaughter, testified that between November 1978 and May 1979, he made six trips for Gonzalez to the Champaign area. On each occasion, Slaughter would contact Gonzalez shortly after arriving in Champaign to report the location of his motel room. Gonzalez would advise him that someone would be by shortly, and William and Carolyn Percival would come to the room shortly thereafter. The Percivals would pick up the cocaine from Slaughter and return to his room a few days later bringing large amounts of cash. On one occasion the Percivals cut into the packages of cocaine and sniffed it while in Slaughter's room to evaluate its quality, apparently because of problems with a previous shipment.

In June of 1979 Yettke was arrested in Champaign. A large quantity of cocaine and currency was seized from him at the time of his arrest. Thereafter, Gonzalez dispatched his couriers to Denver rather than to Champaign.

In the spring of 1980, Florida officials obtained authorization to wiretap Gonzalez's telephones. Some of the tapes were introduced into evidence at trial. In one tape, Middleton asked Gonzalez to send a courier with cocaine to Denver and indicated that he was going to talk to "the photographer." Yettke and Gonzalez both identified "the photographer" as William Percival. In a tape made on May 15, 1980, Middleton asked Gonzalez to send four kilograms of cocaine to Denver. Yettke testified that in May 1980 he obtained 500 grams of cocaine from Percival.

The defendants were indicted on May 27, 1982, along with eight other persons. Count 1 of the indictment alleged a conspiracy to distribute cocaine in violation of 21 U.S.C. §§ 841(a)(1) and 846. Count 10 charged the Percivals with possession with intent to distribute marijuana and hashish in violation of 21 U.S.C. § 841(a)(1). Counts 2–9 are not relevant to this appeal. Yettke, who was then serving a ten-year term for possession with intent to deliver cocaine, entered into a plea bargain with the government and testified against the defendants under a grant of immunity from prosecution. Gregory Quinlan (Gonzalez's buyer in Chicago) and Stephen Songer (Gonzalez's prospective buyer in California) were tried jointly with the defendants but were acquitted at the direction of the trial court before the case was submitted to the jury. Songer was acquitted because there was insufficient evidence that he had agreed to join the alleged conspiracy, and Quinlan was acquitted because of a failure of identification. All other persons either pleaded guilty or were dismissed before trial on motion of the government.

Gonzalez was convicted in January 1981 in Florida for conspiracy to import cocaine into the state of Florida, and was sentenced to thirty years imprisonment. Gonzalez testified against the defendants under a grant of immunity from prosecution.

Prior to trial, Middleton, Songer, and Quinlan moved for a severance and separate trials. The motions were denied. Early in the trial the Percivals moved for severance and Middleton renewed his severance motion, but these motions were denied as well.

Trial commenced on December 13, 1982. At the close of trial, defendants argued that the evidence reflected multiple conspiracies rather than the single conspiracy charged in the indictment. Defendants proffered a jury instruction on multiple versus single conspiracies but the court declined to give it. The jury rendered a verdict of guilty against all three defendants on Count 1, the conspiracy count, on January 6, 1983. On appeal, defendants allege that the evidence at trial proved multiple conspiracies instead of the single conspiracy charged in the indictment, and that the trial court accordingly erred in refusing to correct this fatal variance by granting their motions for severance or by properly instructing the jury on multiple conspiracies.

**B. The Search and Seizure**

Count 10 of the indictment charged William and Carolyn Percival with possession with intent to distribute marijuana and hashish. Although the jury found both defendants guilty, the trial court set aside Carolyn Percival's conviction on this count as against the weight of the evidence.

William Percival's conviction on Count 10 was based on a seizure of marijuana and hashish from the Percivals' residence on August 25, 1981, pursuant to a search warrant. In his affidavit in support of the search warrant request, Special Agent Herbert E. Koepp of the Drug Enforcement Agency stated that in September 1980, he was told by a known informant that the informant had obtained cocaine from Percival at Percival's residence on a number of occasions. On August 24, 1981, Koepp and other agents were conducting surveillance of the Percivals' home when a garbage truck came by and picked up five green plastic trash bags from the premises. The

agents followed the garbage truck and subsequently stopped it and took custody of the five garbage bags. A search of the Percivals' garbage revealed one clear plastic bag and a number of torn pieces of clear plastic that appeared to be the remnants of other plastic bags. Koepp conducted a field test on three randomly selected pieces of the plastic and got a positive reaction for marijuana. Koepp also smelled marijuana residue on the bags. On this basis a search warrant was issued for the Percivals' residence and attached garage.

At about 6:30 p.m. on August 25, 1981, Koepp and other agents executed the search warrant. Both William and Carolyn Percival were present during the search. The agents seized some marijuana, scales, various photographs, records, receipts, and computations from the Percivals' house. They then searched the attached garage, which contained a 1976 BMW automobile. Although a title search revealed that the car was registered to a Mrs. Barbara Percival, Agent Koepp had seen William Percival driving the car on two prior occasions. The agents got the keys to the car from William Percival, unlocked the trunk and removed a suitcase. They opened the suitcase and seized the substantial quantities of marijuana and hashish found therein. The car itself was also seized.

Percival argues that Koepp's affidavit for the search warrant failed to establish probable cause for any search and that the search of the automobile exceeded the scope of the warrant. The government counters that the warrant and pursuant search were proper and that, in any event, Percival waived any objection to the search by failing to file a motion to suppress this evidence prior to trial.

**II. DISCUSSION**

There are four issues to be resolved in this case. They are: (1) whether the evidence at trial proved multiple conspiracies, as defendants allege, rather than the single conspiracy charged in the indictment; (2) whether there was sufficient evidence to support Carolyn Percival's conspiracy con-

viction; (3) whether William Percival's conviction for possession of marijuana and hashish was based on an illegal search and seizure; and (4) whether the trial court erred in denying Middleton an evidentiary hearing on his motion to dismiss the indictment under the Jury Selection and Service Act of 1968, 28 U.S.C. §§ 1861 *et seq.* (1982).

## A. Multiple vs. Single Conspiracy

Defendants first argue, as many conspiracy defendants do, that the proof at trial showed multiple conspiracies rather than the single conspiracy charged in the indictment, and that this variance deprived them of a fair trial. Defendants characterize the conspiracy in this case as a wheel conspiracy, as described by the Supreme Court in *Kotteakos v. United States*, 328 U.S. 750, 755, 66 S.Ct. 1239, 1243, 90 L.Ed. 1557 (1946). In defendants' view, Gonzalez was the hub of this narcotics conspiracy, and his various buyers throughout the country were the spokes. One spoke connected Gonzalez to Middleton in Colorado, and an entirely separate spoke linked him to the Percivals in Champaign. Defendants argue that nothing bound the various spokes together so as to make this a single overall conspiracy.

The Supreme Court has directly addressed the multiple-single conspiracy issue on two occasions. In *Kotteakos,* the Court held that there was a variance between the single conspiracy charged in the indictment and the multiple conspiracies shown at trial, and that the variance was prejudicial error requiring reversal of the defendants' conspiracy convictions. The central figure in the conspiracies involved in *Kotteakos,* Simon Brown, acted as a broker for the various co-defendants in obtaining loans under the National Housing Act. As Brown knew when he obtained the loans, the proceeds were not used for the purposes stated in the applications. 328 U.S. at 753, 66 S.Ct. at 1242. The Court held that the evidence showed a series of separate but similar conspiracies, based on the fact that the sole connection between the

co-defendants was their independent use of Brown as their agent. *Id.* at 754–55, 66 S.Ct. at 1242–43. The following term, the Court described the agreements in *Kotteakos* as follows:

> [N]o two of [the] agreements were tied together as stages in the formation of a larger all-inclusive combination, all directed to achieving a single unlawful end or result. On the contrary each separate agreement had its own distinct, illegal end. Each loan was an end in itself, separate from all others, although all were alike in having similar illegal objects. Except for Brown, the common figure, no conspirator was interested in whether any loan except his own went through. And none aided in any way, by agreement or otherwise, in procuring another's loan. The conspiracies therefore were distinct and disconnected, not parts of a larger general scheme, both in the phase of agreement with Brown and also in the absence of any aid given to others as well as in specific object and result. There was no drawing of all together in a single, over-all, comprehensive plan.

*Blumenthal v. United States,* 332 U.S. 539, 558, 68 S.Ct. 248, 257, 92 L.Ed. 154 (1947).

In *Blumenthal,* the second major Supreme Court case on this issue, the Court found a single overall conspiracy to sell two carloads (about 4,000 cases) of whiskey at over-ceiling prices, in violation of the Emergency Price Control Act. 332 U.S. at 541, 68 S.Ct. at 249. Each co-defendant salesman in *Blumenthal* agreed separately with the central figures, Weiss and Goldsmith, to arrange sales and deliver whiskey to area tavernkeepers in lots varying from 25 to 200 cases. The Court held that the evidence showed a single conspiracy:

> The scheme was in fact the same scheme; the salesmen knew or must have known that others unknown to them were sharing in so large a project; and it hardly can be sufficient to relieve them that they did not know, when they joined the scheme, who those people were or exactly the parts they were playing in carrying out the common design and object of

all. By their separate agreements, if such they were, they became parties to the larger common plan, joined together by their knowledge of its essential features and broad scope, though not of its exact limits, and by their common single goal.

*Id.* at 558, 68 S.Ct. at 257. Although each salesman aided in selling only his part of the whiskey, "he knew the lot to be sold was larger and thus that he was aiding in a larger plan. He thus became a party to it and not merely to the integrating agreement with Weiss and Goldsmith." *Id.* at 559, 68 S.Ct. at 257.

■ As these cases illustrate, the essential question is what the defendants agreed to when they decided to distribute cocaine for Gonzalez. As this court has stated in *United States v. Varelli,* 407 F.2d 735 (7th Cir.1969):

Various people knowingly joining together in furtherance of a common design or purpose constitute a single conspiracy. While the conspiracy may have a small group of core conspirators, other parties who knowingly participate with these core conspirators and others to achieve a common goal may be members of an overall conspiracy.

In essence, the question is what is the nature of the agreement. If there is one overall agreement among the various parties to perform different functions in order to carry out the objectives of the conspiracy, the agreement among all the parties constitutes a single conspiracy.

*Id.* at 742. A single conspiracy cannot be found, however, when there is no overall goal or common purpose. *Id.*

■ In examining the nature of the agreement, direct evidence of the agreement is not required (and often not available). *See Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942). Rather, the agreement can be inferred from the circumstances. *Id. See also United States v. Shelton,* 669 F.2d 446, 451 (7th Cir.), *cert. denied,* 456 U.S. 934, 102 S.Ct. 1989, 72 L.Ed.2d 454 (1982). "While the parties to the agreement must

know of each other's existence," we held in *Varelli,* "they need not know each other's identity nor need there be direct contact." 407 F.2d at 742. In the context of a wheel conspiracy, the question is: "Did the defendant know of the other spokes; did the defendant intend to join those spokes in the large endeavor?" P. Marcus, *The Prosecution and Defense of Criminal Conspiracy Cases* § 4.02[2][a], at 4–15 (1984).

■ Defendants concede, as the evidence amply demonstrates, that they were not only aware of each other's existence but had actually met on several occasions. They contend, however, that despite their knowledge that they were each dealing separately with Gonzalez to distribute cocaine, they were not involved in a single overall conspiracy because there was no "mutual dependence and support" between them. *See United States v. Tercero,* 580 F.2d 312, 316 n. 15 (8th Cir.1978) (parallel narcotics sales operations can be part of the same conspiracy if there is evidence of mutual dependence and support); *United States v. Panebianco,* 543 F.2d 447, 453 (2d Cir.1976) (same), *cert. denied,* 429 U.S. 1103, 97 S.Ct. 1128, 51 L.Ed.2d 553 (1977); *United States v. Tramunti,* 513 F.2d 1087, 1106 (2d Cir.) (although evidence indicated two spheres of operation in narcotics conspiracy, sufficient proof of mutual dependence and assistance to warrant treatment of two spheres as one general business venture), *cert. denied,* 423 U.S. 832, 96 S.Ct. 54, 46 L.Ed.2d 50 (1975). We find that there was sufficient evidence of mutual dependence and assistance between the defendants in this case for the jury to find a single conspiracy to distribute cocaine.

It was Middleton who initially introduced William Percival to Gonzalez. At that meeting, Middleton joined Percival, Yettke, and Gonzalez in a discussion of possible future cocaine transactions. Some time later, when Gonzalez and Middleton flew together from New York to Indianapolis carrying cocaine for Percival, Percival met them at the airport and drove them to Champaign. They waited in a motel room in Champaign while Percival distributed

and then paid them for the cocaine. Still later, when Gonzalez was unable to make deliveries to Illinois, the Percivals and Yettke drove to Denver to pick up part of a very large shipment of cocaine being delivered by Gonzalez to Middleton. Yettke testified that after they arrived in Denver, Percival and Middleton brought the cocaine to Yettke's motel room, where it was hidden until the return trip to Champaign. Finally, in a tape-recorded conversation between Gonzalez and Middleton, Middleton asked Gonzalez to send a shipment of cocaine to Denver and indicated that he was going to talk to "the photographer," who was identified at trial as William Percival.

Taken as a whole, this evidence amply supports the jury's conclusion that there was a common scheme or plan to distribute cocaine in violation of the federal narcotics laws and that the scheme encompassed both Middleton and the Percivals. The defendants were aware of the scope of the distribution scheme when they agreed to join and act in furtherance of it. *See Panebianco*, 543 F.2d at 453 (well-settled that individual narcotics customers and suppliers are members of one overall conspiracy if aware of the size of the middleman's operations). By their separate agreements, "they became parties to the larger common plan, joined together by their knowledge of

its essential features and broad scope, though not of its exact limits, and by their common single goal." *Blumenthal*, 332 U.S. at 558, 68 S.Ct. at 257.

The next question is whether the district court erred in deciding not to give the multiple conspiracy instruction proposed by the defendants.[1] In the instruction conference, after vigorous argument by defendants' counsel that a multiple conspiracy instruction should be given, the trial judge declined to give the instruction because: (1) there was no evidence of separate conspiracies, and (2) the court's basic conspiracy instruction clearly directed the jury first to decide whether the single conspiracy charged in the indictment existed beyond a reasonable doubt and, if it did not, to find the defendants not guilty. The next morning, the court engaged counsel in further extensive discussion on the proposed multiple conspiracy instruction and offered to give it as defendants' theory of the case. The defendants declined that offer. The court again decided not to give a multiple conspiracy instruction because it found no evidence to support multiple conspiracies. The court instead further clarified its conspiracy instruction so as to emphasize that the government had the burden of proving a single, comprehensive conspiracy.[2]

1. Because defendants did not make a specific objection at trial either to the trial court's rejection of their multiple conspiracy instruction or to the conspiracy instruction actually given, we review this issue under the plain error standard.

2. The conspiracy instruction given to the jury read as follows:

 A conspiracy is a combination of two or more persons to accomplish an unlawful purpose. A conspiracy may be established even if its purpose was not accomplished.

 The conspiracy alleged in this case in count 1 is a single, comprehensive conspiracy and that is what the government must prove—the existence of a single comprehensive conspiracy in which the defendants knowingly became participants.

 In determining whether the alleged conspiracy existed, you may consider the actions and statements of all the alleged participants. The agreement may be inferred from all the circumstances and the conduct of all the alleged participants.

 A conspiracy is not proved unless the evidence establishes that at least one overt act was committed by at least one conspirator to further the purpose of the conspiracy.

 In determining whether a defendant became a member of the conspiracy you may consider only the acts or statements of that particular defendant.

 To be a member of the conspiracy, a defendant need not join at the beginning, or know all the other members, or the means by which the purpose was to be accomplished. The government must prove beyond a reasonable doubt, from a defendant's own acts or statements, that he or she was aware of the common purpose and was a willing participant.

 The multiple conspiracy instruction proposed by defendants but refused by the court read as follows:

 Proof of several separate conspiracies is not proof of the single comprehensive conspiracy charged in Count I of the indictment. What you must determine is whether any of these

■ This court has consistently held that it is for the jury to decide whether there is one conspiracy or several when the possibility of a variance appears. *See Varelli*, 407 F.2d at 746. The trial judge is in the best position, however, to determine whether the possibility of a variance exists. *See United States v. Kendall*, 665 F.2d 126, 137 (7th Cir.1981), *cert. denied*, 455 U.S. 1021, 102 S.Ct. 1719, 72 L.Ed.2d 140 (1982). *Cf. United States v. Bastone*, 526 F.2d 971, 980 (7th Cir.1975) (trial judge not required to give multiple conspiracy instruction where evidence of new conspiracies elicited by defense counsel's cross-examination and court's instruction clearly instructed jury that it must find the single, particular conspiracy charged), *cert. denied*, 425 U.S. 973, 96 S.Ct. 2172, 48 L.Ed.2d 797 (1976). As this court has stated:

> Admittedly, the case law requires [a multiple conspiracy] instruction to be given in some situations. However, in this case, where there is a simple one count indictment, where the crime of conspiracy has been previously outlined in other instructions, and where the evidence shows a single ongoing conspiracy, we see no reason to overrule the decision of a respected trial judge merely to be faithful to our previous decision in *Varelli, supra*, which encourages but does not demand the giving of such an instruction. The trial judge was in the best position to determine whether the evidence creat-

ed the possibility of a variance. Now, on appeal, from a position of hindsight, we believe his decision was correct in that such an instruction would only confuse the issue before the jury. However, our decision in this case should not be read as discouraging the giving of an instruction when the possibility of a variance clearly exists.

*United States v. Abraham*, 541 F.2d 1234, 1238–39 (7th Cir.1976), *cert. denied*, 429 U.S. 1102, 97 S.Ct. 1128, 51 L.Ed.2d 553 (1977). Here, as in *Abraham*, we believe that the trial judge properly exercised his discretion based on his finding not only that the evidence showed a single comprehensive conspiracy, but that there was no evidence of multiple conspiracies. In such a case, the jury could well have become confused if the judge had given the multiple conspiracy instruction. We therefore hold that the district court did not err in deciding not to instruct the jury on multiple conspiracies and affirm the defendants' convictions for the single conspiracy charged in the indictment.[3]

## B. Severance

Defendants next argue, based largely on their claim that the evidence proved multiple conspiracies rather than a single conspiracy, that they were substantially prejudiced by the trial court's denial of their motions for severance. Their joint trial,

---

defendants were united in the single conspiracy that has been charged.

The mere fact that one defendant may have been a customer of Edward Gonzalez and purchased controlled substances from or through him, does not establish that the defendant was necessarily part of a single, comprehensive conspiracy with any of the other defendants.

In order to find that any of the defendants were participants in a single, comprehensive conspiracy you should consider, among other matters, whether a defendant had a mutual interest in the outcome of the venture of other defendants, or whether a defendant stood to benefit or profit from the activities of other defendants, or whether a defendant participated in key decisions which affected any other defendants.

If you find that a particular defendant is a member of a different conspiracy other than

the one charged in Count I of the indictment, then you must acquit him or her. In other words to find a defendant guilty of Count I you must find that he or she was a member of the conspiracy charged in that count and not some other independent conspiracy.

3. Even if the evidence at trial had proved multiple conspiracies instead of the single conspiracy charged in the indictment, we question whether the variance would require reversal of the defendants' convictions. *See Berger v. United States*, 295 U.S. 78, 82, 55 S.Ct. 629, 630, 79 L.Ed. 1314 (1935) (true inquiry not whether there has been variance in proof, but whether there has been variance that affects "substantial rights" of accused); *United States v. Lindsey*, 602 F.2d 785, 787 (7th Cir.1979) (listing factors to consider when determining whether a variance is prejudicial).

they contend, allowed the jury to consider evidence as to some individual defendants that was substantially prejudicial to the others, thus infecting the jury's ability to judge each defendant independently and depriving them of a fair trial. Specifically, defendants complain that they were prejudiced both by evidence of Gonzalez's plot with Songer to smuggle plane loads of cocaine into the United States from Chile and by evidence of Gonzalez's agreement to sell one and one-half kilograms of cocaine to Songer for distribution in California.

■■■ The decision whether to grant a motion for severance under Rule 14 of the Federal Rules of Criminal Procedure lies within the discretion of the trial judge and will be reversed only upon a showing of a clear abuse of discretion. *Kendall*, 665 F.2d at 137. In order to obtain a severance, defendants must show actual prejudice from their joinder, "*i.e.*, 'that [they] will be unable to obtain a fair trial without severance, not merely that a separate trial will offer a better chance of acquittal.'" *Abraham*, 541 F.2d at 1240. In considering a motion for severance, the trial judge should give deference to the "strong public interest in having persons jointly indicted tried together, particularly where, as here, a conspiracy is charged and may be proved by evidence that arises out of the same act or series of acts." *United States v. Papia*, 560 F.2d 827, 836–37 (7th Cir.1977). Thus, the ultimate question is "whether the jury can follow the court's limiting instructions so as not to attribute evidence to a defendant against whom it is inadmissible." *Kendall*, 665 F.2d at 137; *Papia*, 560 F.2d at 837.

■■■ The trial judge continually instructed the jury during trial to consider particular evidence against certain defendants only and, at the close of trial, reiterated that "[i]n determining whether a defendant became a member of the conspiracy you may consider only the acts or statements of that particular defendant." Under these circumstances, as the Supreme Court has stated:

To say that the jury might have been confused amounts to nothing more than an unfounded speculation that the jurors disregarded clear instructions of the court in arriving at their verdict. Our theory of trial relies upon the ability of a jury to follow instructions.

*Opper v. United States*, 348 U.S. 84, 95, 75 S.Ct. 158, 165, 99 L.Ed. 101 (1954); *Papia*, 560 F.2d at 837. We believe that the jury was able to follow the clear limiting instructions of the trial court below so as not to attribute evidence to defendants against whom it was inadmissible. Therefore, we find no abuse of discretion in the trial court's denial of the defendants' various motions for severance.

**C. Sufficiency of Evidence as to Carolyn Percival**

■■■ When reviewing the sufficiency of evidence to support a conviction, "we will affirm the trial court unless the evidence, viewed in the light most favorable to the Government, could not have persuaded any rational trier of fact of defendant's guilt beyond a reasonable doubt." *United States v. Mayo*, 721 F.2d 1084, 1087 (7th Cir.1983); *United States v. Redwine*, 715 F.2d 315, 319 (7th Cir.1983), *cert. denied*, — U.S. ——, 104 S.Ct. 2661, 81 L.Ed.2d 367 (1984). Carolyn Percival contends on appeal, as she argued to the jury below, that the evidence at trial showed her to be a mere "hanger-on" to her husband rather than a knowing member of the nationwide Gonzalez conspiracy. As she correctly argues, mere association with conspirators, knowledge of a conspiracy, and presence during conspiratorial discussions is not sufficient to convict a person of conspiracy. *See United States v. West*, 670 F.2d 675, 685 (7th Cir.), *cert. denied*, 457 U.S. 1124, 102 S.Ct. 2944, 73 L.Ed.2d 1340 (1982); *United States v. Garcia*, 562 F.2d 411, 414 (7th Cir.1977). Instead, "there must at least be evidence to support the inference that the defendant in some way joined and participated in the conspiratorial scheme." *Garcia*, 562 F.2d at 414. We hold that there was sufficient evidence to support the jury's determination that Carolyn Perci-

val not only had knowledge of this conspiracy but that she also voluntarily agreed to join and act in furtherance of the conspiracy.

Most of the evidence against Carolyn Percival came from the testimony of Harold Slaughter, one of Gonzalez's couriers, in describing the six times he delivered cocaine for Gonzalez to Carolyn and William Percival in Champaign. Although Slaughter for the most part did not specify who did or said what on these occasions, he did testify that there was conversation among the three of them on each occasion, that on at least one occasion Carolyn Percival carried a tote bag into which the cocaine was deposited, and that Carolyn once complained that it was a bother counting all of the money. In addition, on one visit William Percival opened one of the packages of cocaine and both he and Carolyn sampled it to check its quality. The remaining evidence against Carolyn Percival concerned her participation in the trip to Denver in May of 1978 with her husband and Charles Yettke. Although Carolyn was not present during the actual cocaine transaction in Denver, she travelled to and from Denver with the two men in a rented motor home, in which the cocaine was hidden under some seats for the trip home. The cocaine was divided up back at the Percival residence in Champaign.

Although the evidence against Carolyn Percival is not as strong as the evidence against her husband, as is often the case in conspiracies where some members play more active roles than others, it is sufficient to support the jury's conclusion that Carolyn Percival was not only aware of the conspiracy but also agreed to join it. We therefore affirm Carolyn Percival's conviction for conspiracy to distribute cocaine.

#### D. The Search and Seizure

William Percival argues that his conviction for possession with intent to distribute marijuana and hashish should be reversed because the drugs were seized pursuant to an illegal search of a third party's automobile located in his garage. The search was made pursuant to a warrant to search the Percivals' house and attached garage. Percival contends that the affidavit for the search warrant failed to establish probable cause for the search and that the search of the automobile exceeded the scope of the warrant.

The government responds that Percival waived any objection to the search by failing to file a motion to suppress the evidence or otherwise object to the search at trial. It is true that Percival's court-appointed trial attorney, who is not the attorney representing him on appeal, did not file a motion to suppress the evidence prior to trial. One week before trial, however, Percival sent a letter to the trial judge complaining that his counsel was not properly defending him. Percival stated that his counsel had repeatedly refused to file motions which he had asked him to file, including a motion to suppress the evidence that was taken from his house pursuant to the August 25 search. In response to the letter, the trial judge held an *ex parte* conference with Percival and his attorney, whom the judge described as a "competent experienced lawyer." The attorney told the judge that both he and Carolyn Percival's attorney had become very familiar with the search warrant and that they had "conclusively decided" not to make a motion to suppress.

■ The general rule is that any objections to the introduction of evidence at trial are waived on appeal if not presented to the trial court. *See United States v. Welsh,* 721 F.2d 1142, 1145 (7th Cir.1983); *United States v. Weed,* 689 F.2d 752, 756 (7th Cir.1982). In the circumstances of this case, therefore, defendants concede that this court may not consider whether the evidence was illegally obtained unless it is clear from the record that plain error was committed. *See Weed,* 689 F.2d at 756; Fed.R.Crim.P. 52(b). *See generally* 3 C. Wright, *Federal Practice and Procedure* § 678, at 803–04 (1982).

■ Turning to the merits of Percival's claim, we agree with the magistrate's de-

termination that Agent Koepp's affidavit established probable cause for issuance of the search warrant. *Cf. United States v. Pritchard*, 745 F.2d 1112, 1120 (7th Cir. 1984) (magistrate's determination of probable cause to be given considerable weight by reviewing court). Koepp's judgment that the plastic bags in the Percivals' garbage had contained saleable quantities of marijuana, in addition to information from a known informant that Percival had sold drugs to the informant in the past, supported a finding of probable cause to believe that there were drugs at the Percivals' house when the warrant was issued.

The more difficult question is whether the search of the automobile in the Percivals' garage exceeded the scope of the search warrant, which authorized a search of the Percivals' house and attached garage. The Supreme Court held in *United States v. Ross*, 456 U.S. 798, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982), that a lawful search of fixed premises generally extends to every part of the premises in which the object of the search may be found, notwithstanding the fact that separate acts of opening or entry may be required to complete the search. *Id.* at 820–21, 102 S.Ct. at 2170. Thus, the Court held, "a warrant that authorizes an officer to search a home for illegal weapons also provides authority to open closets, chests, drawers, and containers in which the weapon might be found." *Id.* at 821, 102 S.Ct. at 2170.

Percival argues that a vehicle should not be viewed in the same way as other personal effects on the premises because a car has a lesser connection to the premises than furniture, desks, cabinets, and other personal items. *See* 2 W. LaFave, *Search and Seizure* § 4.10, at 158–59 (1978) (hereinafter cited as "LaFave"). Although a car is less fixed than a closet or cabinet, however, it is no less fixed than a suitcase or handbag found on the premises, both of which can readily be searched under *Ross* if capable of containing the object of the search. Professor LaFave asserts, and we agree, that the better practice would be to include a description of the occupant's vehicle in the warrant when the warrant is intended to extend to the car. LaFave, *supra*, at 159. We do not believe, however, that such a practice is mandated in every instance by the Fourth Amendment. We therefore agree with other courts that have addressed this issue and hold that a search warrant authorizing a search of particularly described premises may permit the search of vehicles owned or controlled by the owner of, and found on, the premises. *See United States v. Bulgatz*, 693 F.2d 728, 730 n. 3 (8th Cir.1982) (warrant for search of house justifies search of car parked in garage attached to house), *cert. denied*, 459 U.S. 1210, 103 S.Ct. 1203, 75 L.Ed.2d 444 (1983); *United States v. Freeman*, 685 F.2d 942, 955 (5th Cir.1982) (warrant for search of premises justifies search of jeep parked on premises); *United States v. Napoli*, 530 F.2d 1198, 1200 (5th Cir.) (warrant for search of house justifies search of camper parked in driveway), *cert. denied*, 429 U.S. 920, 97 S.Ct. 316, 50 L.Ed.2d 287 (1976); *United States v. Beall*, 581 F.Supp. 1457, 1466 (D.Md.1984) (warrant for search of auto body shop justifies search of U-Haul truck parked within shop); *see also* LaFave, *supra*, at 158 n. 39 (collecting cases). *Cf. United States v. Stanley*, 597 F.2d 866, 870 (4th Cir.1979) (warrant for search of mobile home does not justify search of car parked nearby when car is in common tenant parking lot not annexed to the home or within general enclosure surrounding the home).

The limitation that the vehicle to be searched must be owned or controlled by the owner of the premises searched brings us to Percival's last possible contention—that there was no showing that the BMW in his garage was under his control. Percival contends that prior to searching the trunk of the car, the agents discovered that the car was owned by a third party. The only testimony on this issue at trial, however, was that of Agent Koepp, who testified that at some undetermined time "a search [of the title to the BMW] was made." That search, whenever it took place, revealed that the car was registered

to Mrs. Barbara Percival. Agent Koepp testified that he had seen William Percival driving the BMW on two prior occasions and that Percival possessed the keys to the car. The car was locked and enclosed in the Percivals' garage. These facts adequately demonstrate that Percival exercised sufficient dominion and control over the car to permit its search pursuant to the search warrant. Indeed, Percival admits as much in his brief by asserting his "dominion and control" over the car and his "right to exclude others" in establishing his standing to object to the search.

▮ In sum, the search of the BMW in the Percivals' garage was within the scope of the search warrant issued for the Percivals' residence. Finding no plain error in the trial court's admission of the evidence seized during this search, we affirm William Percival's conviction for possession with intent to distribute marijuana and hashish.[4]

### E. Grand Jury Challenge

The last issue on appeal is whether the trial court erred in denying Middleton an evidentiary hearing on his motion to dismiss the indictment under the Jury Selection and Service Act of 1968, 28 U.S.C. §§ 1861 *et seq.* (1982). The purpose of the Act, which prohibits discrimination and promotes random selection in the formation of grand and petit juries, is to ensure that all litigants entitled to trial by jury "shall have the right to grand and petit juries selected at random from a fair cross section of the community in the district or division wherein the court convenes." 28 U.S.C. § 1861 (1982). The Act provides that a defendant in a criminal case may move to dismiss the indictment or stay the proceedings against him on the ground of substantial failure to comply with the provisions of the Act if the motion is made "before the voir dire examination begins, or within seven days after the defendant discovered or could have dis-

covered, by the exercise of diligence, the grounds therefor...." 28 U.S.C. § 1867(a) (1982). Upon filing a motion under subsection (a), "containing a sworn statement of facts which, if true, would constitute a substantial failure to comply with the provisions of this title," the moving party is entitled to an evidentiary hearing and the opportunity to present in support of the motion "the testimony of the jury commission or clerk, if available, any relevant records and papers not public or otherwise available used by the jury commissioner or clerk, and any other relevant evidence." 28 U.S.C. § 1867(d) (1982). If the court determines that the grand jury was selected in a manner constituting a substantial failure to comply with the Act, the court may either dismiss the indictment or stay the proceedings until a grand jury is selected in conformity with the Act, whichever is appropriate. *Id.*

Defendant Middleton joined in a pre-trial motion filed by Stephen Songer to dismiss the indictment pursuant to 28 U.S.C. § 1867(a) on August 20, 1982, nearly three months after the indictment was returned. On September 2, 1982, they filed in support of their motion the affidavit of Ruth Astle, an attorney and expert in jury selection procedures, in which she stated that based upon the limited information then available to her, "Blacks, wage earners, young people and possible other identifiable groups have been systematically and intentionally excluded from grand juries and petit juries, including the grand jury that indicted defendant in the Central District of Illinois." Astle's allegation was based on her preliminary findings that despite statistically significant numbers of blacks, wage earners, and young people comprising significant percentages of the total population of the Danville Division of the Central District of Illinois in the years 1981–82, there were practically no blacks, wage earners, or young people on the panel that indicted the defendants.

4. Percival also argues that statements he made admitting his possession of the car keys should be inadmissible on the ground that they were made without the benefit of *Miranda* warnings.

We find this argument meritless. Indeed, the contention is somewhat puzzling, as nothing in the record indicates that any such statements were ever made.

Astle's affidavit and the motion to dismiss the indictment both requested discovery of the Central District's jury selection procedures in order to adequately determine whether specific cognizable groups were intentionally and ·systematically excluded from grand and petit jury panels in the Central District. On September 21, the district court issued an order permitting discovery of "all records, documents, forms, papers and devices, including individual juror questionnaires, relating to the process of selecting the grand and petit juries" in the Central District. *Cf. Test v. United States,* 420 U.S. 28, 30, 95 S.Ct. 749, 750, 42 L.Ed.2d 786 (1975) (per curiam) (holding that § 1867 gives criminal defendants unqualified right to inspect jury lists during preparation and pendency of § 1867 motion). On October 12, the district court granted defendant Songer's oral motion for additional time "within which to compile necessary information to constitute sworn statements of fact as required by 28 U.S.C. § 1867(d)." The court gave Songer until November 12 to file the section 1867(d) sworn statements of fact with the court, and scheduled a hearing on the motion for December 6, 1982. When nothing was filed, the district court denied the motion to dismiss the indictment on November 24. In denying the motion, the court expressed concern that the defendants' failure to comply with the time limitations of section 1867 would interfere with the demands of the Speedy Trial Act.

On December 2, 1982, defendants filed the information that had been due twenty days earlier,[5] and sought reconsideration of the November 24 order. The trial court denied the motion for reconsideration because it found no excusable neglect for the failure to seek an extension of time within which to file or to inform the court of the defendants' intention not to comply with the November 12 deadline. Based on its

observations, the court concluded that "the failure to file the information and the motion itself are dilatory tactics engaged in by the defendants and intended to delay the trial of the case." The court accordingly denied defendants' motion to reconsider the November 24 order and also denied their motion to vacate the scheduled trial date of December 13 in order to permit them to pursue the matter in an interlocutory appeal to this court.

Defendants then sought a writ of mandamus from this court to compel the district court to grant them an evidentiary hearing on their motion. This court denied the request for a writ on December 10, 1982, finding no abuse of discretion on the part of the trial judge.

 Middleton's only legal argument on appeal is that the Astle affidavit of September 2, 1982, constituted the sworn statement required by 28 U.S.C. § 1867(d), and that the trial court thus erred in denying him an evidentiàry hearing. We find this argument meritless. Section 1867(d) clearly requires a motion to dismiss the indictment under subsection (a) to contain a sworn statement *of facts* which, if true, would constitute a substantial failure to comply with the provisions of the Act. *See United States v. Foxworth,* 599 F.2d 1, 3 (1st Cir.1979). The motion that defendants filed on August 20 did not contain the requisite sworn statement. Astle's affidavit, which was filed shortly thereafter, stated only that blacks, wage earners, and young people comprised a significant percentage of the population in the Danville Division of the Central District, and that "persons who viewed the grand jury panel that indicted defendant, noticed that practically no Blacks appeared on the panel, practically no wage earners appeared on the panel, [and] practically no young people appeared on the panel...." Even if true, the fact that one grand jury

---

**5.** This information consisted of the affidavit of Dr. John McConahay of Duke University, which summarized his and Ruth Astle's statistical analysis of the grand and petit jury pools in the Central District of Illinois. The results indicated that blacks and young persons were sub-

stantially or significantly underrepresented in the Central District Master and Qualified Wheels. For instance, the study showed that an eligible black person had approximately a 50 percent less chance of being in the Central District Qualified Wheel than the average person.

panel, composed of between sixteen and twenty-three members, contained unknown but low numbers of blacks, wage earners, or young people, would not constitute a substantial failure to comply with the Act. It is the master jury wheel, not the actual grand jury, which must represent a fair cross section of the community. *See United States v. Gregory,* 730 F.2d 692, 699 (11th Cir.1984), *cert. denied,* — U.S. —, 105 S.Ct. 1170, 84 L.Ed.2d 321 (1985); 28 U.S.C. § 1863(b)(3) (1982). So long as the master jury wheel is adequate and the prescribed procedure is thereafter followed, there can be no complaint that the panel ultimately produced by random selection is somehow unrepresentative in result. *United States v. Gometz,* 730 F.2d 475, 483 (7th Cir.) (en banc) (Cudahy, J., concurring in part and dissenting in part), *cert. denied,* — U.S. —, 105 S.Ct. 155, 83 L.Ed.2d 92 (1984).

In short, the Astle affidavit falls woefully short of the statement of facts required by section 1867(d). *See United States v. Koliboski,* 732 F.2d 1328, 1331 (7th Cir. 1984) (no error in denial of motion for stay or dismissal of proceedings when defendant made no showing that there was substantial failure to comply with provisions of Act); *Blake v. Cich,* 79 F.R.D. 398, 401 (D.Minn.1978) (bare conclusory allegation in motion for new trial that jury panel "appeared to be skewed against minorities and youths" substantively inadequate and untimely). Realizing this, defendants requested and the trial court allowed discovery of the Central District's jury selection procedures. The court repeatedly reminded the defendants that they had not yet provided him with the sworn statement of facts required by section 1867(d) and that the extension of time to November 12 was to give them additional time within which to do so. In spite of the court's admonitions, the defendants neither filed the required sworn statement nor sought to extend the time for doing so by the November 12 deadline.

In light of the foregoing, the trial court acted well within its discretion in denying the defendants' August 20 motion to dismiss the indictment or stay the proceedings. Having failed to comply with the express statutory requirements of section 1867(d), defendants were not entitled to an evidentiary hearing to challenge the Central District's grand and petit jury selection procedures.

## III. CONCLUSION

In conclusion, we affirm the conspiracy convictions of all three defendants, affirm William Percival's conviction for possession with intent to distribute marijuana and hashish, and find no error in the district court's denial of an evidentiary hearing on Middleton's motion to dismiss the indictment under the Jury Selection and Service Act of 1968.