**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Marcus O. EVANS, Samuel Tidwell,
Gregory Fort, and Helen L. Fort,
Defendants–Appellants.**

Nos. 94–3633, 94–3690, 94–3691,
94–3727 and 95–3112.

United States Court of Appeals,
Seventh Circuit.

Argued April 10, 1996.

Decided Aug. 9, 1996.

Rehearing and Suggestion for Rehearing
En Banc Denied in
No. 94–3691 Sept. 19, 1996.

Barry Rand Elden, Chief of Appeals, Office of the U.S. Atty., Crim. Appellate Div., Chicago, IL, John G. McKenzie, Keith C. Syfert, Office of the U.S. Atty., Rockford, IL, Elizabeth Collery (argued), Dept. of Justice, Crim. Div., Washington, DC, for the U.S. in No. 94–3633.

Barry Rand Elden, Chief of Appeals, Office of the U.S. Atty., Crim. Appellate Div., Chicago, IL, Elizabeth Collery (argued), Dept. of Justice, Crim. Div., Washington, DC, for the U.S. in Nos. 94–3690, 94–3691, 94–3727 and 95–3112.

Gary Seeling (argued), Waukesha, WI, for Marcus Evans.

Howard B. Levy (argued), Chicago, IL, for Samuel Tidwell in Nos. 94–3690, 95–3112.

Douglass C. Hochstetler (argued), Marshall, O'Toole, Gerstein, Murray & Borun, Chicago, IL, for Greg Fort.

Mark A. Byrd (argued), Byrd & Taylor, Rockford, IL, for Helen L. Fort.

Before POSNER, Chief Judge, and CUMMINGS and DIANE P. WOOD, Circuit Judges.

POSNER, Chief Judge.

The four defendants who are the appellants in this court were tried together before a jury for offenses relating to the sale of powder and crack cocaine and were convicted. Three were sentenced to life imprisonment without possibility of parole and the fourth (Helen Fort) to 26 years. We count 29 separate issues and 390 pages of briefs in these appeals, but most of the issues have too little merit to warrant discussion.

The appellants were members of a 19–person drug ring active between 1989 and 1993 in Rockford, Illinois. Seven, including all four appellants, constituted a core group that called itself the "Mob." The core group bought powder cocaine in kilogram quantities and, with the aid of the peripheral members, resold the cocaine, at a rate of approximately two or three kilograms a month, in smaller quantities, often after "cooking" it into crack. Most of the crack was sold in "dime bags," which generally sell for $10 apiece, at crack houses operated by the ring. The peripheral members either worked at the crack houses ("workers") or carried drugs to, and the proceeds of the sales of the drugs from, the crack houses ("runners"). The core group met roughly once a week, made decisions by

majority vote, and divided the profits of the ring among the members of the group equally. The group supervised the workers, runners, crack cookers, and other peripheral members of the conspiracy, as well as procuring the kilogram quantities of drugs, repacking them in the dime bags, managing the ring's money, and performing other tasks, including some performed regularly by workers and runners.

■ The core members tended to go about heavily armed—and not only with the bottle of Dom Perignon that they broke over the head of one of their runners in a dispute about money. They had pistols and assault rifles galore along with bulletproof vests, and they shot and were shot, though no fatalities are mentioned. A search of defendant Tidwell's residence turned up four loaded guns, and he was convicted, along with drug trafficking, of using or carrying a firearm during and in relation to a drug offense, in violation of 18 U.S.C. § 924(c). There was no evidence that he "used" any of his guns in the new sense of "use" that the Supreme Court impressed upon the statute in *Bailey v. United States*, — U.S. —, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995). That is, there is no evidence that he made any *active* use of these guns; they may, so far as the evidence shows, have been purely for protection. All this is irrelevant. There is no objection to the instruction, which did not attempt to define the terms "use" or "carry," and plenty of evidence that Tidwell "carried" guns within the meaning of the statute, even if he didn't "use" them within that meaning. If a jury is directed to convict if it finds either $x$ or $y$ (here, either use or carriage), and there is no evidence of $x$ but plenty of $y$, and it convicts, the conviction will stand despite the absence of evidence of $x$. *Griffin v. United States*, 502 U.S. 46, 59, 112 S.Ct. 466, 474, 116 L.Ed.2d 371 (1991); *United States v. Briscoe*, 65 F.3d 576, 584 n. 9 (7th Cir.1995). The jury is assumed to have found the facts in accordance with the evidence. Tidwell is therefore not entitled to a new trial on the charge that he violated section 924(c).

■ The issue pressed hardest by defendant Helen Fort is whether she was placed in double jeopardy by the forfeiture of some $28,000 in personal property (weapons, jewelry, and a bank account) that the FBI seized when she was arrested. The question whether a civil forfeiture proceeding is punishment within the meaning of the Eighth Amendment has now been answered "no" by the Supreme Court. *United States v. Ursery*, — U.S. —, 116 S.Ct. 2135, 135 L.Ed.2d 549 (1996). But the claim was frivolous from the start because while there was a seizure, ripening into an administrative forfeiture, there was no judicial forfeiture. *United States v. Torres*, 28 F.3d 1463, 1465 (7th Cir.1994); *United States v. Idowu*, 74 F.3d 387, 394–96 (2d Cir.1996). A seizure turns into a judicial forfeiture when the person whose property has been seized takes the proper steps to get it returned yet fails, so that he loses the property as the result of a judgment. If he fails to take these steps, no judgment is entered (so no jeopardy attaches) and the property is treated as abandoned; this is administrative forfeiture.

Concretely, when a federal law enforcement agency seizes property that the person it is seized from would like to get back, the person must file a claim with the agency, in this case the FBI, and either post a bond (normally 10 percent of the value of the property seized) to cover the agency's costs of storage and maintenance of the property or persuade the agency to allow the claimant to proceed in forma pauperis, without having to post a bond. 19 U.S.C. § 1608; 21 U.S.C. § 881(d); 19 C.F.R. § 162.47(e); *Linarez v. U.S. Dept. of Justice*, 2 F.3d 208, 210 (7th Cir.1993). If pauper status is denied, the claimant can either post the bond or challenge the denial by filing an action in federal district court to set aside the denial as "arbitrary" or "capricious" within the meaning of the Administrative Procedure Act. 5 U.S.C. §§ 704, 706(2)(a); see *Jones v. DEA*, 801 F.Supp. 15, 24 (M.D.Tenn.1992); *Application of Williams*, 628 F.Supp. 171, 173 (E.D.N.Y. 1986). The waiver of the bond is mandatory if the claimant is in fact a pauper, 19 C.F.R. § 162.47(e), and it would be anomalous if the government could pauperize you by seizing all your property and then prevent you from challenging the seizure by denying you pauper status, thus requiring you to post a bond

with money that you don't have. Once the bond is posted or pauper's status granted, the administrative claim is perfected and if the agency wants to keep the property it must seek a court order of forfeiture. 19 U.S.C. § 1608; 21 C.F.R. § 1316.78; *Linarez v. U.S. Dept. of Justice, supra*, 2 F.3d at 210. That is judicial forfeiture. No order was sought here because Helen Fort was denied pauper status, did not challenge the denial though represented by counsel, and did not post a bond. She thus abandoned the property—or perhaps had never had any interest in it.

Gregory Fort complains about the seizure of drugs from the trunk of his car. One of the gang's crack houses was a two-family house at 1433 Mulberry Street in Rockford. Upon an ample showing of probable cause to believe that it was indeed a crack house and that Gregory Fort resided there, at least intermittently, the police obtained a warrant to search the house "with detached garage." When they executed the warrant the police found a car parked in the garage, searched it, and found several packages of powder and crack cocaine in the trunk. The car belonged to Gregory Fort, who argues that the police should have gotten another warrant before searching the car. Our review of this issue has been hampered by the absence of the warrant from the record. All we have are some excerpts submitted by the prosecutor. The appellant did not include the warrant in the appellate record, so is deemed to acknowledge the accuracy and representativeness of the excerpts.

*United States v. Percival*, 756 F.2d 600, 612–13 (7th Cir.1985), holds that a warrant to search a residence and attached garage authorizes the search of a car found in the garage. We do not understand Fort to be challenging the soundness of that decision or to be making anything of the difference between an attached and a detached garage. But he points out that Percival was (or at least so our opinion assumed) the owner of the house and garage searched there, and he urges us to confine the holding of the *Percival* case to owners. We cannot think of any reason for distinguishing between an owner and a tenant, or for that matter between an owner or tenant on the one hand and a sublessee or intermittent occupant—either of which terms may be a more apt description of Fort's position at 1433 Mulberry Street— on the other hand. The police knew it was a crack house that Fort, whom they had reason to believe was involved in the drug trade, frequented and in which he sometimes resided. It was reasonable for them to suppose that his use of the property might extend to the garage, since he had been seen driving in the vicinity of 1433 Mulberry Street, and that either the house or the garage might contain contraband or evidence of crime.

■ A warrant to search a house or other building authorizes the police to search any closet, container, or other closed compartment in the building that is large enough to contain the contraband or evidence that they are looking for. *Id.* at 612; *United States v. Ross*, 456 U.S. 798, 820–21, 102 S.Ct. 2157, 2170–71, 72 L.Ed.2d 572 (1982); *United States v. Griffin*, 827 F.2d 1108, 1114–15 (7th Cir.1987); *United States v. Gray*, 814 F.2d 49, 51 (1st Cir.1987). If they are looking for a canary's corpse, they can search a cupboard, but not a locket. If they are looking for an adolescent hippopotamus, they can search the living room or garage but not the microwave oven. If they are searching for cocaine, they can search a container large enough to hold a gram, or perhaps less.

■ It seems to us that a car parked in a garage is just another interior container, like a closet or a desk. If, as in this case, the trunk or glove compartment is not too small to hold what the search warrant authorizes the police to look for, they can search the trunk and the glove compartment. That, we think, is the holding of *Percival*; it is not tied to ownership. Decisions of the other circuits are in accord. *United States v. Vaandering*, 50 F.3d 696, 701 (9th Cir.1995); *United States v. Sturmoski*, 971 F.2d 452, 458 (10th Cir.1992); *United States v. Singer*, 970 F.2d 1414, 1417–18 (5th Cir.1992).

■ Although the police happened to know that the car they were searching was Fort's, it does not matter whose it is unless it obviously belonged to someone wholly uninvolved in the criminal activities going on in

the house. If an innocent guest leaves a trunk in his host's house and the police obtain a search warrant to search the house for something small enough to fit in the trunk, then, unless it is apparent that the trunk does not belong to anyone connected with the illegal activity—a condition that will rarely be satisfied—the police can search the trunk and if it happens to contain evidence that the guest is a criminal after all, albeit innocent of any involvement in the criminal activities of his host, he is out of luck. We thus agree with *United States v. Giwa*, 831 F.2d 538, 543–45 (5th Cir.1987), which rejected an automatic defense for "casual visitors."

The case is no different if the trunk is the trunk of an automobile that an overnight guest has parked in his host's garage. *United States v. Motz*, 936 F.2d 1021, 1025 (9th Cir.1991). It is relatively uncommon, however, for someone to park his car in a garage attached to or associated with a private residence, as opposed to a public garage or a garage in an apartment house. The rule of *Percival* does not extend to these other garages. Having a warrant to search a person's apartment "and garage" does not entitle the police to search every car in the garage of the apartment house. *United States v. Stanley*, 597 F.2d 866, 870 (4th Cir.1979); see 2 Wayne R. LaFave, *Search and Seizure: A Treatise on the Fourth Amendment* § 4.10(c), pp. 668–69 (3d ed. 1996).

■ We turn to the sentencing issues, which also mainly involve Gregory Fort. A very curious issue is the date on which he was sentenced. Amendments to the federal sentencing guidelines that went into effect on November 1, 1993, lowered the base offense level for offenses involving crack; and had the amendments applied to defendants Tidwell and Gregory Fort their sentences might have been shorter. The judge pronounced sentence on them on October 27 (Fort) and 28 (Tidwell), and he based these sentences on the guidelines in effect on those days. But the judgments were not entered by the clerk of the district court on the docket sheet until November 4. Fort argues that the sentence was not imposed until the judgment was entered, and Tidwell that his lawyer was

guilty of ineffective assistance in failing to ask the judge to delay the sentencing beyond November 1. Tidwell's argument gives us little pause, as he does not suggest any ground that his lawyer might have had for asking the judge for a delay. If the shoe were on the other foot, and delay in sentencing would result in a higher sentence, we do not think that Tidwell would acknowledge the right of the prosecutor to move for a delay in sentencing without any better ground than wanting to have a different sentence. Criminal defense lawyers, like other lawyers, do not have an ethical duty to make groundless arguments; indeed, they have an ethical duty not to make such arguments. *United States v. Gomez*, 24 F.3d 924, 926 (7th Cir.1994); *United States v. Sanchez–Estrada*, 62 F.3d 981, 986 n. 11 (7th Cir.1995); *United States v. Rivera*, 68 F.3d 5, 8 (1st Cir.1995). The refusal to act unethically by making a groundless argument can never be a ground for arguing ineffective assistance of counsel.

■ As for Fort's argument, the statute requires the judge to apply (to the extent the ex post facto clause permits) the sentencing guidelines "that are in effect on the date the defendant is sentenced." 18 U.S.C. § 3553(a)(4)(A). The term "sentencing" in legal as in ordinary language refers to the pronouncing of sentence by the judge in open court, rather than to the subsequent recording of the sentence on a docket sheet. This understanding is confirmed by the federal sentencing statute, which requires the district court, "at the time of sentencing," to state in open court the reasons for "its imposition of the particular sentence." 18 U.S.C. § 3553(c). If Fort and Tidwell were right, the required statement of reasons would come before, rather than at the time of, sentencing, contrary to the statute. More important, the judge, when pronouncing sentence shortly before the effective date of a change in the guidelines, would not be certain which guidelines to proceed under because he would not know exactly when the clerk would enter the judgment on the docket sheet.

It is true that for purposes of appeals and corrections of sentence the critical date is the date of the entry of judgment rather than the

date on which the sentence is pronounced. *United States v. Clay,* 37 F.3d 338, 340 (7th Cir.1994). Fed. R.App. P. 4(b) is explicit that the time for taking a criminal appeal runs from the date of "the entry either of the judgment or order appealed from." And while Rule 35(c) (correction of sentence by sentencing judge) is inexplicit ("7 days after the imposition of sentence"), the court in *Clay* thought that the practice under Rule 35(c) should be conformed to the practice in taking an appeal because correcting a sentence serves a similar purpose, that of revising the judgment. A Rule 35(c) correction tolls the time for appealing. *United States v. Turner,* 998 F.2d 534, 536 (7th Cir.1993); *United States v. Morillo,* 8 F.3d 864, 868–69 (1st Cir.1993). It would be pretty confusing if the time for making the correction ran from the time of the pronouncing of sentence even though the time for appealing did not start to run until the entry of the judgment. No such confusion results from interpreting "the date the defendant is sentenced" in 18 U.S.C. § 3553(a)(4)(A) as the date on which sentence is pronounced in open court.

The district judge found that at least half the cocaine sold by the defendants in the final period of the conspiracy was crack. This finding had a big impact on the defendants' sentences, because the sale of crack is punished much more heavily than the sale of powder cocaine. U.S.S.G. § 2D1.1(c). The judge based his finding on testimony by a turncoat member of the core group that during the relevant period the "majority" of the cocaine sold by the conspiracy was in the form of crack. The testimony was believable and believed, and was corroborated by a variety of other evidence. At argument Gregory Fort's lawyer conceded that the judge's finding was supported by a preponderance of the evidence but urged us to lay down a rule that quantity findings that have a large impact on sentence must be supported by clear and convincing evidence. It is doubtful that the rule would make a difference in this case, because the judge pronounced himself confident that during the relevant period the conspiracy sold at least half its cocaine in crack form. But in any event a majority of the full court declined recently to examine the issue, *United States*

*v. Rodriguez,* 73 F.3d 161 (7th Cir.1996), and it would be inappropriate for this panel to attempt to reopen it.

■ The last issue we need discuss is whether Gregory Fort's sentence was rightly enhanced on the ground that he was a "leader" of the conspiracy. A leader of a criminal activity or enterprise that has five or more participants receives a four-level bump-up in sentence. U.S.S.G. § 3B1.1(a). Fort argues that as a latecomer to the "Mob" (the core group of the conspiracy, remember), he could not be regarded as the leader, and also that he was not shown to have supervised at least five members of the peripheral group of conspirators that consisted of workers, runners, crack cookers, and security guards.

The guideline does not exclude the concept of collective leadership. The Rockford drug ring was managed by a seven-member "board of directors" that included Gregory Fort. The commitment of this board to majority vote gave each member, including Fort, a position of authority tantamount to leadership, as is further shown by the fact that the members split the profits of the conspiracy equally among themselves. The fact that fewer than five members of the peripheral group actually reported to Fort is immaterial. *United States v. McGuire,* 957 F.2d 310, 316–17 (7th Cir.1992). Individual employees of a corporation generally do not report to individual members of the board of directors; nevertheless the board is the corporation's collective leadership.

The judge had an alternative ground for sticking Fort with the four-level enhancement for leadership. Section 3B1.1(a) applies to defendants who are leaders of a criminal enterprise or activity that has five or more participants or is "otherwise extensive." The judge thought that even if Fort did not "lead" five or more participants in the conspiracy, the conspiracy had so many more than five participants (19, remember) that it must have been otherwise extensive. The word "otherwise" suggests, however, as do the cases, *United States v. Randy,* 81 F.3d 65, 68–69 (7th Cir.1996); *United States v. Briscoe, supra,* 65 F.3d at 590 and n. 17, that the reference to "extensive" activity is to an

activity that is extensive even though it has fewer than five participants, or at least fewer than five criminally liable participants. So a Fagan-type gang, which employs children too young to be charged with crime, or a small gang that operates through persons who are mere unknowing instruments, or perhaps a gang that while small uses modern computer and communications technology to extend its tentacles worldwide, could be thought "*otherwise* extensive." This is a matter that the Sentencing Commission would be well advised to clarify, but it does not affect the sentences of these defendants, since it was merely an alternative ground.

The other issues require no discussion. By filing separate briefs, even though there is no conflict among the defendants' positions, and by briefing every conceivable issue plus the kitchen sink, the defendants' lawyers both enabled the government to play divide-and-conquer in its brief and argument (both superb) and deprived their appeals of focus. Nevertheless we have tried conscientiously to examine all the issues and to discuss all those—few—that have at least arguable merit. We find no error, with the possible but irrelevant exception of the district judge's interpretation of "otherwise extensive."

Affirmed.