Willie L. JONES, Plaintiff,

v.

UNITED STATES DRUG ENFORCEMENT ADMINISTRATION, Claude Byrum, Stephen A. Wood, and one additional unknown officer, Defendants.

No. 3:91–0520.

United States District Court,
M.D. Tennessee,
Nashville Division.

July 16, 1992.

E.E. (Bo) Edwards, III, Edwards & Simmons, Nashville, Tenn., for plaintiff.

Michael L. Roden, Office of the U.S. Atty., Nashville, Tenn., for defendants.

## MEMORANDUM

WISEMAN, District Judge.

### I

On February 27, 1991, three police officers seized $9000.00 in United States currency from Willie L. Jones at the Nashville International Airport. The currency was subsequently the subject of summary forfeiture proceedings by the Drug Enforcement Administration (DEA) of the United States Department of Justice. In this action, Mr. Jones seeks the return of his currency and declaratory relief against the officers—Claude Byrum and Stephen Wood of the Metropolitan Nashville Police Department and Taran Perry of the Metropolitan Airport Authority—and the DEA. For the purposes of the defendants' motions for summary judgment, we accept the plaintiff's allegations as true.

The plaintiff operates Jones Landscaping in Nashville, Tennessee, and occasionally purchases plants for use in his business from companies located out of state. On February 27, 1991, he decided to travel to Houston, Texas, and asked a coworker to make the airline reservations. In accordance with the plaintiff's instructions, and after being told that the plaintiff could use the full-fare ticket on any flight with space available, the coworker booked as early a return flight as possible.

Upon arriving at the Nashville airport, the plaintiff approached the American Airlines ticket counter, and tendered cash for his ticket. The ticket price was $267. The ticket agent told the plaintiff that she did not know how to handle a cash transaction, and stepped into an adjacent office momen-tarily. At about this time, defendant officer Byrum received an anonymous phone tip that the plaintiff had paid for his ticket with cash, and had been acting in a "suspicious" manner.

Officers Byrum and Wood approached the security checkpoint and observed the plaintiff enter the checkpoint. The checkpoint operator informed the officers that the plaintiff was carrying in his overnight bag a piece of paper on which numbers were written. Defendant Byrum also observed a large bulge on the plaintiff's person in the area of his left waistband.

After passing through the security checkpoint, the plaintiff entered the seating area of gate C–8, and waited for his plane. The officers approached the plaintiff, informed him that they were officers, and that they suspected him of carrying drugs or drug-related currency. The officers asked the plaintiff to accompany them to a more private location, and they led him to an unused jetway entrance.

Officer Perry joined the three men at the jetway, and the officers asked the plaintiff for identification. He produced his driver's license and the airline tickets (issued in his own name), which indicated that they were purchased with cash. One officer asked if he could search the plaintiff's overnight bag. The plaintiff consented, and the officer searched the bag. Officer Perry then began a pat-down search of the plaintiff, and discovered $9000.00 in currency in a money pouch located beneath the plaintiff's waistband. The parties dispute the scope of the plaintiff's consent to these searches.

Upon discovering the currency, the officers led the plaintiff to the airport office of the Drug Interdiction Unit (DIU). The DIU is an airport-based joint venture among the DEA, the Airport Authority, and the Metropolitan Police Department. While in the office, the officers questioned the plaintiff. When asked why he was travelling with such a large amount of cash, the plaintiff responded that he was going to Houston to look for plant stock for his landscaping business. When the

officers did not believe his explanation, the plaintiff stopped answering their questions.

The defendants contend that while at the office, a trained police dog "alerted" on the currency, indicating that it had been exposed to narcotics. The officers informed the plaintiff that they were confiscating his currency, and they returned his airline ticket. Defendant Byrum also gave the plaintiff a receipt for an "undetermined amount of U.S. currency." The plaintiff left the office, but returned a short time later, and asked defendant Byrum for a more specific receipt. He refused to count the currency, and the plaintiff left.

The DEA commenced summary forfeiture proceedings against the currency by publishing notice in *USA Today*, and by mailing notice to the plaintiff at his home. After twice refusing to grant the plaintiff's request for a waiver of the bond requirement, the DEA declared the currency forfeit. The facts surrounding the denial of the waiver application are discussed in more detail below.

The plaintiff then brought this action, and in his Amended Complaint he seeks a declaratory judgment that the defendants' seizure of the currency was illegal, that the statutory and regulatory scheme for making bond waiver decisions is unconstitutional, and that the defendants be ordered to return his currency. He bases these claims upon the Administrative Procedure Act, 5 U.S.C. §§ 705–06 (1988), the Civil Rights Act, 42 U.S.C. § 1983, and the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution.

Presently before this Court is defendants' motion to dismiss and for summary judgment, in which they make the following arguments: First, that the DEA cannot be sued *eo nomine*, as plaintiff has done here; Second, that the defendant officers are entitled to qualified immunity for their actions; Third, that the defendant officers were not state actors, and hence cannot be liable under the Civil Rights Act, 42 U.S.C. § 1983; And fourth, that the plaintiff fails as a matter of law to establish a due process claim. The DEA also claims that its denial of the bond waiver application was not arbitrary.

Each of these arguments are without merit, and the Court denies the defendants' motion to dismiss and for summary judgment. In addition, the Court holds that the DEA's bond waiver decision is subject to judicial review, and that in this case, the DEA's denial of the plaintiff's application was arbitrary, capricious, and an abuse of discretion.

## II

The standards governing the decision on a motion for summary judgment are well-established. Summary judgment is appropriate only when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986); *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476–80 (6th Cir.1989). The party seeking summary judgment bears the initial burden of showing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553. Upon meeting this burden, the burden shifts to the nonmoving party, which cannot rest on its pleadings, but must present some "specific facts showing that there is a genuine issue for trial." *Id.* at 324, 106 S.Ct. at 2553. A dispute about a material fact is "genuine" within the meaning of Fed.R.Civ.P. 56 only if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient." *Id.* at 252, 106 S.Ct. at 2512. Of course, the court is to construe the evidence and all inferences to be drawn from it in the light most favorable to the nonmoving party. *Id.* at 255, 106 S.Ct. at 2513–14.

## III

The DEA contends that the plaintiff cannot sue the "United States Department of Justice—Drug Enforcement Administra-

tion" *eo nomine*—under that name. Citing *Blackmar v. Guerre*, 342 U.S. 512, 72 S.Ct. 410, 96 L.Ed. 534 (1952), for this proposition, the DEA argues that Congress has not waived sovereign immunity with regard to the DEA or the Department of Justice, the department to which the DEA belongs, and that the DEA should be dismissed as a party defendant.

These arguments are without merit in a suit such as this, involving judicial review of administrative action under the Administrative Procedures Act, 5 U.S.C. Chapter 7 (1988). In its 1976 amendments to the APA, Congress specifically overruled the *Blackmar* case in the administrative context. The amendment to § 703 added the penultimate sentence to the current section, which reads:

> ... If no special statutory review proceeding is applicable, the action for judicial review may be brought against the United States, the agency by its official title, or the appropriate officer.

5 U.S.C. § 703 (1988). Federal courts have subsequently allowed suits against Federal agencies pursuant to the amended § 703. *Ford v. Department of Housing and Urban Development*, 450 F.Supp. 559 (N.D.Ill.1978); *Computerware, Inc. v. Knotts*, 626 F.Supp. 956 (E.D.N.C.1986). Significantly, the right to name a federal agency as a party defendant has been applied to the DEA in challenges to civil forfeiture actions. *Sarit v. Drug Enforcement Administration*, 759 F.Supp. 63, 69 (D.R.I.1991).

*City of Whittier v. United States Department of Justice*, 598 F.2d 561, 562 (9th Cir.1979), on which the DEA relies, is inapposite to this case. *City of Whittier* involved a subrogated claim against the government under the Federal Tort Claims Act, not the judicial review of agency action under the APA. As such, § 703 of the APA was not triggered, and the *eo nomine* issue was not resolved by statutory mandate.

Our interpretation of § 703 is commanded by the clear language of the statute, and the court need go no further in dispensing of this issue. Other sources demonstrate, however, that the government's *eo nomine* and sovereign immunity arguments are not only without merit, but are nigh frivolous. The legislative history of this amendment is unequivocal. The House Report on S.800 notes:

> When an instrumentality of the United States is the real defendant, the plaintiff should have the option of naming as defendant the United States, the agency by its official title, appropriate officers, or any combination of them. The outcome of the case should not turn on the plaintiff's choice.

Judicial Review—Administrative Agency Actions, H.R.Rep. No. 94–1656, 94th Cong., 2d Sess. 18 (1976) (reprinted in 1976 U.S.C.C.A.N. 6121, 6138). The Senate Report contains an identical statement. Judicial Review of Agency Action, S.Rep. No. 94–996, 94th Cong., 2d Sess. 16–17 (1976).

The legislative history also underscores that this amendment was remedial in nature, and was designed to prevent injustice because of minor defects in the pleadings. Senator Kennedy, speaking for S.800 on the Senate Floor, said:

> Frequently a citizen sues an agency, naming the agency as defendant, only to be thrown out of court for failing to name the individual officer as defendant. If a statute of limitations has run, the aggrieved citizen is without further remedy. Whether the Government can be held accountable in the courts for improper conduct should not turn on the niceties of who is named in the pleading.

122 Cong.Rec. 22011 (July 1, 1976). The House Report noted:

> In the committee's view the ends of justice are not served when government attorneys advance highly technical rules in order to prevent a determination on the merits of what may be just claims.

Id. at 18–19.

Even the Department of Justice's concern in 1976 was with naming the United States as defendant, rather than naming an agency as plaintiff has done here. As then-Assistant Attorney General Scalia wrote on behalf of the Department of Justice during the consideration of S.800, the

government's principal fear with the amendment to § 703 was that if plaintiffs were permitted to name the United States as defendant, rather than an officer or agency, pleadings may be so lacking in specificity that the Department would have to "circularize the Government in order to respond to the complaint." Judicial Review of Agency Action, S.Rep. No. 94–996, 94th Cong., 2d Sess. 24, 25 (1976) (Exhibit C, letter of Assistant Attorney General Antonin Scalia to Senator Edward Kennedy, May 10, 1976).

■ The applicability of the APA to this case (discussed in greater detail below) also disposes of the government's claim that sovereign immunity has not been waived with respect to the DEA. The 1976 amendments to § 702 of the APA constitute a clear waiver of sovereign immunity where, as here, the relief sought is "other than money damages." 5 U.S.C. § 702. See *Ghandi v. Police Dep't of City of Detroit*, 747 F.2d 338, 343 (6th Cir.1984). The plaintiff's demands in this case are equitable in nature (although the plaintiff will receive money if successful, he is seeking the return of the money he alleges was wrongfully taken from him), and he asserts that he is suffering legal wrong because of agency action. The waiver of sovereign immunity in § 702 applies. *Willis v. United States*, 787 F.2d 1089, 1092 (7th Cir. 1986).

### IV

■ The individual officer defendants argue that qualified immunity shields them from liability, because their actions were reasonable, citing *Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Their appeal to *Harlow* is unavailing, however. In announcing an "objective legal reasonableness" test for applying qualified immunity, the Court in *Harlow* explicitly limited its holding:

We emphasize that our decision applies only to suits for civil *damages* arising from actions within the scope of an official's duties and in "objective" good faith. We express no view as to the

conditions in which injunctive or declaratory relief might be available.

*Id.* at 819 n. 34, 102 S.Ct. at 2739 n. 34. The Supreme Court having reserved this question, this Court must turn to the law of this circuit for guidance.

Sixth Circuit cases clearly establish that the shield of qualified immunity protects official defendants only where monetary damages are sought. *Guercio v. Brody*, 911 F.2d 1179, 1189 (6th Cir.1990); *Hensley v. Wilson*, 850 F.2d 269, 273 (6th Cir.1988). In this case, the plaintiff seeks only equitable relief. See Amended Complaint, p. 5–6. The three officers remain in this lawsuit to answer only in equity in their official capacities, and do not possess qualified immunity as to equitable remedies. See *Littlejohn v. Rose*, 768 F.2d 765, 773 (6th Cir. 1985).

### V

■ The individual officers next argue that the § 1983 claims against them should be dismissed because they acted under federal rather than state law when they seized the plaintiff's currency. It is clear that the Civil Rights Act, 42 U.S.C. § 1983 (1988) requires state action. The question in this case is whether these individuals—two officers of the Metropolitan Police Department of Nashville/Davidson County, Tennessee, and one officer of the Metropolitan Airport Authority—were "state actors" for § 1983 purposes.

The Supreme Court's decision in *West v. Atkins*, 487 U.S. 42, 108 S.Ct. 2250, 101 L.Ed.2d 40 (1988), provides the standard for determining whether a defendant in a § 1983 suit acted under color of state law. The Court observed that the traditional test had looked to the source of the defendant's power. The question under this approach was whether the defendant "exercised power 'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" Id. at 49, 108 S.Ct. at 2255 (quoting *United States v. Classic*, 313 U.S. 299, 326, 61 S.Ct. 1031, 1043, 85 L.Ed. 1368 (1941)). The Court also noted that it had also held, in *Lugar v. Edmondson Oil Co.*, 457 U.S.

922, 935, 102 S.Ct. 2744, 2752, 73 L.Ed.2d 482 (1982), that if the defendant's conduct would constitute state action under the Fourteenth Amendment, it is "fairly attributable to the State." *West*, 487 U.S. at 49, 108 S.Ct. at 2255 (quoting *Lugar*, 457 U.S. at 937, 102 S.Ct. at 2753). The Court in *West* concluded:

"The deprivation must be caused by the exercise of some right or privilege created by the State ... or by a person for whom the State is responsible," and "the party charged with the deprivation must be a person who may fairly be said to be a state actor." "State employment is generally sufficient to render the defendant a state actor." It is firmly established that a defendant in a § 1983 suit acts under color of state law when he abuses the position given to him by the State. Thus, generally, a public employee acts under color of state law while acting in his official capacity or while exercising his responsibilities pursuant to state law.

*West*, 487 U.S. at 49–50, 108 S.Ct. at 2255 (citations omitted).

The Sixth Circuit has precisely adhered to the Supreme Court's formula in *West*. See *Cassady v. Tackett*, 938 F.2d 693, 695 (6th Cir.1991). As did the Supreme Court in *West*, the Sixth Circuit has carefully noted that the exceptions to these standards are narrow, and are limited to "public officials who perform an essentially private function." Id. n. 2 (citing *Polk County v. Dodson*, 454 U.S. 312, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981) (holding that a public defender does not act under color of state law when defending a client in a criminal proceeding).

The facts of this case relating to the officers' employment at the airport are not entirely clear. The airport seizure at issue took place on February 27, 1991. According to Defendants' Response to Plaintiff's First Set of Interrogatories, an appendix to the plaintiff's brief on this issue, the three officers were first assigned to the Middle Tennessee Drug Enforcement Task Force in September of 1989. Id. at 2–3. On September 4, 1990, approximately a year after their assignment, the Metropolitan Nashville Airport Authority, the Metropolitan Nashville Police Department, and the Drug Enforcement Administration entered into an agreement which formed the "Nashville International Airport CTI (Commercial Transportation Interdiction) Unit." See *DEA State and Local Agreement*, Plaintiff's Response to Defendants' Motion to Dismiss, Appendix C. The DEA was to be the "lead agency," providing "general and specific direction in operational and administrative matters," including whether arrests would take place in Nashville or elsewhere. Id. Although the officers were to be deputized as federal agents, this appears not to have taken place until after the seizure of the plaintiff's currency.

Under the test announced in *West*, described above, the officers acted under color of state law when they interrogated the plaintiff and seized his currency. We begin with the observation that these officers were state employees, and that this is normally sufficient to satisfy the color of state law requirement. Nor do they fall into the "essentially private function" exception to the general rule. Furthermore, although they acted at the direction of the DEA and in furtherance of its goals, the officers possessed their authority solely by virtue of state law. See, for example, Tenn.Code Ann. §§ 38–8–101 et seq. (1991); Id. § 40–7–101 (1990). They eventually were deputized as federal agents, but at the time of this seizure, their powers to conduct the investigation derived from their status as local police officers. Although there is some dispute as to whether they introduced themselves to the plaintiff as federal or local officers, it appears that they never explained their purported federal status or the federal provenance of the law under which they justified seizing his currency. From the evidence before this Court, the sole indication to the plaintiff that this was other than a purely local operation are the initials "DEA" in tiny print at the bottom of the receipt which they gave the plaintiff. The factual dispute is sufficient to make summary judgment inappropriate on this issue.

It is also clear that the mere adoption of state action by a federal agency does not deprive that action of its state law origins, and does not deprive the actors of the undeniable state basis of their authority. The Sixth Circuit's recent decision in *Miami County Municipal Court v. Wright*, 963 F.2d 876 (6th Cir.1992), provides an interesting comparison. In both that case and this one, state officers attempted to demonstrate that their actions were federal rather than state in nature. In *Miami County*, an Ohio State Highway Patrol officer seized currency after an automobile search following a routine traffic stop. He turned the money over to a fellow officer who was a liaison to the Drug Enforcement Administration. The DEA "adopted" the forfeiture, and took possession of the currency. Meanwhile, the owner of the currency filed suit in state court seeking the currency's return, and the state court ordered the officer who seized it to turn it over to the court. The officer was unable to do so because the currency had been transferred to the DEA (which declined to return it), and the officer was arrested after being found in contempt.

The Ohio Attorney General removed the suit to District Court under 28 U.S.C. § 1442 (1988), arguing that the officer was a federal agent with respect to the seized funds, and that the federal forfeiture statute, 21 U.S.C. § 881, provided a federal defense. The district judge held that the officer had been cloaked in federal authority, but that he had failed to raise a cognizable federal defense. The state appealed.

The Sixth Circuit affirmed, but concluded that the officer had not been a federal agent with respect to the funds. Although the eventual result of the seizure was that the DEA adopted the forfeiture, at no time did the state trooper "act at the direction of the federal government," because the seizure was incidental to the normal course of his duties as a state officer. The Court of Appeals concluded that the forfeiture statute, § 881, was not intended to deputize federally state and local officials. Id.

In conclusion, there is nothing about the facts of this case which makes unreason-able the inference that the local police officers were acting under color of state law when they seized the currency at issue here. The officers were state employees, authorized by the state, and without formal federal authority. The federal procedures used to complete the seizure and commence forfeiture do not retroactively immunize the officers' conduct at the time of the seizure itself, which is the basis for the plaintiff's § 1983 claims against them. Summary judgment must be denied on this issue.

## VI

The plaintiff makes two related due process claims: that the regulations under which the DEA makes bond waiver decisions are facially unconstitutional, and that their application to him violated his rights under the Due Process Clause of the Fifth Amendment. The defendants respond that the plaintiff had adequate notice of the forfeiture and failed to avail himself of the opportunity to challenge the forfeiture by posting the bond required by statute. They argue that their decision to deny him an *in forma pauperis* waiver was justified, and that in any event, *in forma pauperis* is a privilege, not a right.

### Facts Relevant to the Forfeiture

Following the seizure of the currency on February 27, the DEA mailed to the plaintiff a Notice of Seizure on March 18, 1991. In addition to describing the seizure, the Notice informed the plaintiff of his right to request a waiver of the bond requirement, and advised him that he must "fully disclose" his finances. On April 12, 1991, the plaintiff filed a claim of ownership and a sworn request for a waiver of the bond requirement. The DEA denied the plaintiff's request, and sent a form letter on April 24, 1991. Beside the box which was checked, the explanation for the action taken was that the "Affidavit of Indigency [was] not adequately supported." Plaintiff's Response, Appendix C, attachment 1(e).

On May 1, the plaintiff's counsel wrote a letter to the DEA requesting an explanation of the denial. The DEA never re-

sponded, and, lacking further guidance, the plaintiff sent a supplemental affidavit accompanied by a letter from his counsel on May 10. The DEA responded on June 3, in a letter which explained that "[y]our claim and affidavit are being returned as unsupported in light of your documented standard of living, as well as the supplemental affidavit you submitted." On December 5, 1991, the DEA declared the currency forfeited.

In order to place the DEA's decision in context, it is important to explain the contents of the two affidavits. Pursuant to the DEA's instructions, the plaintiff's first affidavit used Form 4 of the Federal Rules of Appellate Procedure as its guide. On this affidavit, the plaintiff stated that he had job-related income of approximately $400.00 per month, self-employment income in the past year of $7,510.00, and no liquid assets. He also owned a 1979 Ford truck which he valued at $600.00. The plaintiff's second affidavit went into greater detail, and was written in narrative form. In the second affidavit, signed on May 10, 1991, the plaintiff stated that through the first four months of 1991, he had self-employment income of $5000.00, and that his income (comprised entirely of self-employment income) was approximately $400 per week. He explained that the statement in his original affidavit—that he earned $400 on a monthly basis—had been a typographical error. He added that since the first affidavit he had finished making payments on a second used truck, which he also used in his business.

Statutory and Regulatory Background

Neither party provides an adequate explanation of the strange structure of statutes and regulations governing forfeiture. The journey begins with a section of the Drug Abuse Prevention Act, 21 U.S.C. § 881(a)(6) (1988), which provides that money "furnished or intended to be furnished by any person in exchange for a controlled substance in violation of this subchapter" is subject to forfeiture. Subsection (d) of that section provides that the customs laws (i.e., the Tariff Act of 1930, particularly 19 U.S.C. §§ 1602–18) govern these forfeiture proceedings. Customs laws are, therefore, appropriated for use in civil forfeiture cases arising out of suspected narcotics traffic.

The Tariff Act has two tiers of forfeiture: summary disposition for property falling within the classes enumerated in 19 U.S.C. § 1607(a), and judicial forfeiture through condemnation proceedings. Prior to 1984, the dividing line between the two tiers was based on value: property valued at $10,000 or above received judicial forfeiture, that below received summary, administrative forfeiture. In the 1984 amendments to the Act, however, Congress effectively permitted summary forfeiture for all currency; Section 1607 now lists "monetary instruments" (including currency) as subject to summary forfeiture without regard to value. A person claiming an interest in property subject to summary forfeiture can obtain judicial forfeiture proceedings by posting the lesser of $5,000 or a 10% bond, with a minimum of $250. 19 U.S.C. § 1608.

The statute itself contains no provision for *in forma pauperis* exceptions to the bond requirement, and in *Wiren v. Eide,* 542 F.2d 757 (9th Cir.1976), the Ninth Circuit held that § 1608's application to deny poor people the right to a hearing was unconstitutional. The court stated: "the fifth amendment prohibits the federal government from denying the opportunity for a hearing to persons whose property has been seized and is potentially subject to forfeiture solely because of their inability to post a bond." Id. at 763.

In 1980, the Customs Service responded to *Wiren* by amending its implementing regulations to provide that "[u]pon satisfactory proof of financial inability to post the bond, the district director shall waive the bond requirement for any person who claims an interest in the seized property." 19 C.F.R. § 162.47(e) (as amended by 45 F.R. 84993–94 (Dec. 24, 1980)). The Service viewed this as both complying with the Constitution's mandate, and as codifying the Service's existing practice of granting waivers on the basis of indigency. 45 F.R. 84993. Thus, the regulation which is at the

heart of the present dispute in this case was a response to a court decision, and was not expressly authorized by statute.

### Judicial Review Under the Administrative Procedures Act

■ The DEA's decisions regarding *in forma pauperis* applications are subject to judicial review. We begin with the general rule that agency decisions are subject to judicial review in the absence of Congressional intent to preclude it. *Abbott Laboratories v. Gardner*, 387 U.S. 136, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967). Where the decision is whether or not to enforce a law in a given case, the decision is presumptively unreviewable. *Heckler v. Chaney*, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985).

Chapter 7 of Title 5 of the United States Code, codifying the Administrative Procedure Act (APA), defines the availability and scope of review of agency decisions. Section 701(a) of the APA provides two exceptions to the Chapter's application:

> (a) This chapter applies, according to the provisions thereof, except to the extent that—
>> (1) statutes preclude judicial review; or
>> (2) agency action is committed to agency discretion by law.
>
> . . . . .

5 U.S.C. § 701 (1988). The APA thus embodies the principle that agency action is reviewable in the absence of contrary legislative intent.

Neither exception in § 701(a) obtains in the present case; therefore, judicial review is available. As described above, the Customs regulation the DEA used as the basis for this decision was self-imposed following a finding that the bond requirement was unconstitutional without an *in forma pauperis* exception. No statute precludes judicial review, because no statute authorizes or mandates the regulation. This is also not a matter committed to agency discretion by law. The Supreme Court has observed that this exception is extremely narrow, and applies only in cases in which "statutes are drawn in such broad terms that in a given case there is no law to

apply." *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971) (quoting S.Rep. No. 752, 79th Cong., 1st Sess. 26 (1945)). By its terms, this exception cannot apply where no statute authorizes the regulation. Thus, 5 U.S.C. § 701 does not preclude judicial review in this case.

■ We next turn to the standard of judicial review. Under 5 U.S.C. § 706(2), this Court reviews the DEA's decision to deny the plaintiff's *in forma pauperis* petition for arbitrariness, capriciousness, or abuse of discretion. Under this narrow standard, the Court must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Ohio Bell Telephone Co. v. F.C.C.*, 949 F.2d 864, 872 (6th Cir.1991) (citing *Overton Park*, 401 U.S. at 416, 91 S.Ct. at 823). The agency must "articulate a rational connection between the facts found and the choice made," and the Court may not supply a basis for the decision that the agency did not itself give. Id.

The DEA's decision in the case at hand is best described in the language of the APA itself: Arbitrary, capricious, and an abuse of discretion. Two factors compel the Court to reach this conclusion: First, the DEA's articulated justification is inadequate and irrational; second, the decision is clearly erroneous, and betrays a failure to consider relevant factors.

The paucity of justification for this decision is troubling, given the preclusive effect which the decision to deny the application has on the plaintiff's right to the bare necessities of due process. The plaintiff was first alerted to problems with his application when the DEA mailed a form letter on April 24, 1991, which stated that his application was defective because his "Affidavit of Indigency [was] not adequately supported." There is no indication of the basis for this conclusion, or whether "adequately supported" referred to substantive or evidentiary problems. Nor could the plaintiff have inferred what the problem was from the boxes on the form letter

which were not checked—each of these relate to mere technical problems with the application (for example, that the Affidavit of Indigency was not sworn). The DEA's inadequate response is made particularly maddening by the fact that the plaintiff submitted an Affidavit of Indigency which, as instructed by the Notice of Seizure, complied in all respects with Form 4 of the Federal Rules of Appellate Procedure.

> The plaintiff's counsel wrote the DEA on May 1, desperately seeking guidance: It is quite unclear how this affidavit is "not adequately supported." Your form letter gives no clue as to why this conclusion was reached about the affidavit or how "adequate support" could be furnished.

Plaintiff's Response, Appendix C, attachment 1(d). The DEA failed to respond in any fashion. Finally, on May 10, the plaintiff signed a Supplemental Affidavit, and submitted this along with a letter from counsel. The Supplement described in detail the plaintiff's financial straits. To this, the DEA responded: "Your claim and affidavit are being returned as unsupported in light of your documented standard of living, as well as the supplemental affidavit you submitted. Plaintiff's Response, Appendix C, attachment 1(b). Apparently, these documents constitute the sole record of the DEA's decision to deny the plaintiff's *in forma pauperis* petition. See Defendants' Response to Plaintiff's First Set of Interrogatories 8, Answer to Question 11.

The DEA's purported rationale—that the application was "unsupported"—is inadequate and irrational under either an evidentiary or substantive interpretation of this term. If the DEA was referring to evidentiary support, their conclusion flies in the face of the only evidentiary requirements they announce to those whose property is seized: compliance with Form 4 of the Federal Rules of Appellate Procedure. Plaintiff's Affidavit of Indigency conforms in all material respects to this form. Next, we consider whether there was inadequate substantive support.

### The First Affidavit

█ An interpretation of "support" as a substantive deficiency is no more rational. In his initial affidavit, the plaintiff said that he had income of $400 per month. In fact, as noted above, this was an error, and Plaintiff had an income of $400 per week, as he stated in his Supplemental Affidavit. In his first affidavit, he stated that he had self-employment income of $7,510 for the past year (which is, on average, $144.42 per week),[1] and that his sole asset was a 1979 Ford truck valued at $600. Thus, *according to the first affidavit*, the plaintiff had approximately $733.26 in gross income (roughly $300 from his job-related income, and $433.26 in self-employment income) for the twenty day period within which he was permitted to post the bond. In addition to himself, the plaintiff's wife and three children all tax these meager resources. The statute required that the plaintiff post a bond of $900—clearly more than he could command during this time even if he disregarded his and his family's needs.

The DEA's initial decision thus demonstrates the agency's irrational approach to Plaintiff's waiver application. Even though the Supplemental Affidavit indicates that the numbers the plaintiff supplied were in error, they necessarily formed the basis of the DEA's decision on the initial application.

One can only conclude that the DEA's decision on the initial affidavit either was not based on a reasoned assessment of the plaintiff's condition, or was based on a disbelief in the contents of the plaintiff's affidavit that was at once groundless in light of the DEA's knowledge at the time, and unarticulated. That the DEA acted without adherence to any rational standard is further buttressed by the agency's re-

---

1. For the purposes of assessing the DEA's decision on the first affidavit, the Court assumes that the plaintiff's reported self-employment income roughly predicts his weekly self-employment income. The assumption that the plain-tiff's business retains its viability is nonetheless ironic, in light of the DEA's suggestion—implicit in its very seizure of the currency—that the business is not bona fide.

sponses to the plaintiff's requests for production during discovery in this suit. When asked specifically for all documents relating to the DEA's initial decision to deny the waiver application, and relating to its decision to deny the supplemental request, the DEA responded that there were none, other than the cryptic letters described above. Plaintiff's Response, Appendix C.

### The Second Affidavit

Turning to the denial of the plaintiff's application based on his Supplemental Affidavit, we conclude that this decision is also clearly erroneous. We first must determine what facts were before the DEA as they made this second decision.

As noted above, the plaintiff's submissions to the DEA are not a model of consistency. They are, nonetheless, reconcilable in light of the strict format of Form 4 of the Federal Rules of Appellate Procedure, and the seasonal nature of the plaintiff's business. The plaintiff's response to two of Form 4's questions are the cause of the confusion. Question 1 asks: "Are you presently employed?" To this, the plaintiff responded: "Yes, $400/month, Landau Landscaping." Question 2 asks: "Have you received within the past twelve months any income from a business, profession, or other form of self-employment, or in the form of rent payments, interest, dividends, or other source?" The plaintiff responded: "Yes, Self–Employment in Jan. 717 Calhoun Ave., Nashville, TN. Amount Received: $7,510.00."

Form 4's two questions serve two distinct purposes: Question 1 asks for current employment-related income. In most cases, the claimant who is employed by another person or company can provide a response regarding current income that is accurate because he or she works under an agreement which sets the compensation terms. Question 2 asks for self-employment income over the past year. Because self-employment income varies with the demand for the claimant's services, this is typically more difficult to predict, hence the retrospective nature of the question.

The plaintiff's Supplemental Affidavit makes clear that he misunderstood the distinction between the two questions, and that he was mistaken in the way he characterized his income. He described his circumstances as follows:

During the first four months of 1991 (through April 30), my net income from my landscaping business has been approximately $5000. (Please note a typographical error in my initial affidavit; my income is approximately $400 per week, not per month.) I have earned no income except from my business. All of my net income has been used to support and maintain my family....

Plaintiff's Response, Appendix C, attachment 1(c), at 1. The plaintiff's Supplemental Affidavit thus corrects the initial affidavit. From the Supplemental Affidavit, the plaintiff's weekly income is $400.

While at first glance, these two statements appear contradictory, on closer inspection, there is a much simpler answer. It is clear from the second affidavit that the plaintiff responded to the questions posed by Form 4 without realizing that they sought two different kinds of income. He corrected this on the Supplemental Affidavit, and the defendants can point to nothing which detracts from the credibility of this later statement. The Supplemental Affidavit itself, which suggests two different income levels ($5000 for four months, and $400 per week), these are not contradictory in light of the unpredictability of self-employment income, and the seasonal nature of landscape contracting. In short, the defendants cannot rely on the apparent inconsistencies to justify their disbelief in the plaintiff's inability to post the bond.

■ Looking at the Supplemental Affidavit by itself, the DEA's refusal to waive the bond requirement is clearly erroneous. Under the facts of the Supplemental Affidavit, the plaintiff's weekly income of $400 per week would provide him with approximately $1200 for the twenty-day period provided for him to raise the bond. After deducting the $900 bond from this sum, the plaintiff would have had $300 to feed, clothe, and house himself and his family

for three weeks. It is clear from both the initial affidavit (in which he stated that he had no savings to which he could turn) and the quoted portion of the Supplemental Affidavit that the plaintiff and his family live from paycheck to paycheck. Under these circumstances, the bond presented the unconscionable choice between food and shelter, and due process.

The DEA's decision affronts established, relevant standards for indigence. Justice Goldberg's concurrence in *Hardy v. United States*, 375 U.S. 277, 84 S.Ct. 424, 11 L.Ed.2d 331 (1964), provides a useful and flexible definition of indigence for purposes of determining when costs must be waived:

> Indigence "must be conceived as a relative concept. An impoverished accused is not one totally devoid of means." [citation omitted]. *An accused must be deemed indigent when "at any stage of the proceedings [his] lack of means ... substantially inhibits or prevents the proper assertion of a [particular] right or claim of right."* [citation omitted] *Indigence must be defined with reference to the particular right asserted.* Thus, the fact that a defendant may be able to muster enough resources, of his or of a friend or relative, to obtain bail does not in itself establish his nonindigence for the purpose of purchasing a complete trial transcript or retaining a lawyer.

Id. at 290 n. 7, 84 S.Ct. at 431–32 n. 7 (Goldberg concurring) (emphasis added). While this case does not involve a threat to liberty, the plaintiff's right to any hearing at all on the legality of the seizure of his property depends on his ability either to provide the bond or to prove his inability to do so.

A claimant need not establish penury in order to demonstrate that his lack of means "substantially inhibits or prevents" his assertion of his rights. *Jefferson v. United States*, 277 F.2d 723 (9th Cir.1960). That the considerations relevant to this decision are relative to the right asserted is particularly salient in view of the constitutional infirmity of a statutory forfeiture scheme which would deny any hearing to those unable to post a bond. *Wiren v. Eide*, 542 F.2d 757 (9th Cir.1976). The defendants' assertion that *in forma pauperis* status is a privilege, not a right, is wholly unpersuasive. Setting aside the demise of the right/privilege distinction, see, for example, *Rutan v. Republican Party of Illinois*, 497 U.S. 62, ——, 110 S.Ct. 2729, 2742, 111 L.Ed.2d 52, 72 (1990) (Stevens concurring), *Wiren* compels the conclusion that the denial of a waiver to one who is truly indigent constitutes a violation of due process. *Camp v. Oliver*, 798 F.2d 434, 437 (11th Cir.1988), upon which the defendants rely, describes *in forma pauperis* as a "privilege" solely for the purpose of explaining the appropriate standard of review—a standard which this Court applies today in reviewing the agency's decision.

Because the waiver opportunity must be meaningful, it is impermissible to require those in the plaintiff's situation to subject their families to severe privation merely to obtain an opportunity to vindicate their interests. The government may constitutionally use its bond requirement to preclude the litigation of frivolous claims of ownership and to protect itself from the costs of maintaining the forfeited property, but it may not use this power to create an effectively insurmountable barrier to indigent claimants with colorable claims.

The forfeiture bond also possesses unique characteristics which require decisionmakers to take a generous approach in evaluating waiver applications. Unlike civil claims brought under the statutory *in forma pauperis* grant, 28 U.S.C.A. § 1918 (Supp.1992), in which the prospective litigant usually has several years (the period of limitations) to save for the costs of a lawsuit, forfeiture claimants must provide the bond within twenty days following the first publication of notice. In practical effect, forfeiture claimants face a statute of limitations which is less than three weeks long. Their failure to meet its demands may subject them to the loss of a home, a vehicle, or—as is alleged here—the means to operate a business on which they depend for their livelihood—all without a hearing of any kind.

In addition, this Court observes that in this case the government's interest in the bond itself is minimal. A forfeiture bond under 19 U.S.C. § 1608 (1988) is a cost bond, not a penal bond, and is at risk only to the extent of the cost of the forfeiture proceedings. *United States v. Real Property and Residence*, 920 F.2d 788, 790 (11th Cir.1991). The DEA is permitted to prove its costs under 21 C.F.R. § 1316.-76(b), which include "storage cost, safeguarding, court fees, marshal's costs, etc." Id. Unlike property such as realty which requires special maintenance, currency is easily stored and cared for. None of the costs which the DEA is likely to incur in this case are substantial, and the United States' interest is adequately protected by holding the claimant ultimately responsible for them in the event of his defeat.

This case demonstrates well the hardships which a grudging attitude toward waiver can work on the claimant and his or her family. Based on the plaintiff's affidavits, the bond in this case constituted two-thirds of the plaintiff's gross employment income for the three weeks he was given to raise it after each response from the DEA. The plaintiff was substantially inhibited from asserting his rights by the contradictory demands which the bond requirement and his duty to his family placed upon him. We find that the plaintiff was, and is, unable to pay the bond required under 19 U.S.C. § 1607 (1988). The DEA's decision to deny the plaintiff's application for a waiver of the bond requirement must be reversed, because it was arbitrary, capricious, and an abuse of discretion. The bond is, therefore, waived. In the event that he does not prevail on the underlying claim, the plaintiff will be required to pay the costs under 21 C.F.R. § 1316.76(b) (1991) for which the bond secured payment.

## VII

 Having found that the DEA's decision is subject to judicial review and must be reversed, the Court need not address the significant constitutional questions Plaintiff has raised about the regulatory scheme for waiver. It is well-established that judicial restraint requires this Court to refrain from reaching constitutional issues in advance of the necessity of deciding them. *Lyng v. Northwest Indian Cemetery Protective Association*, 485 U.S. 439, 108 S.Ct. 1319, 99 L.Ed.2d 534 (1988); *Ashwander v. Tennessee Valley Authority*, 297 U.S. 288, 346–48, 56 S.Ct. 466, 482–83, 80 L.Ed. 688 (1936) (Brandeis concurring). For the same reason, this Court declines to reach today the question of whether the DEA's denial of the plaintiff's waiver application constituted agency action "contrary to constitutional right, power, privilege or immunity" under 5 U.S.C. § 706(2)(B) (1988).

Turning now to the next phase of this suit: Had the plaintiff either posted bond or obtained a waiver, the defendants would have been required to turn the property over to the United States Attorney to initiate formal forfeiture proceedings. 19 C.F.R. § 162.47(d) (1991). Adhering to this procedure, however, serves no purpose and would only cause needless delay. This Court therefore agrees with the Ninth Circuit that because the plaintiff has raised the issue with this Court, we should proceed to the merits of the complaint. *Wiren v. Eide*, 542 F.2d 757 (9th Cir.1976).

For the reasons stated above, the defendants' motion to dismiss and for summary judgment are DENIED, the forfeiture bond requirement is ordered WAIVED because of the plaintiff's indigency, and the case is set for hearing on the merits on Monday, August 24, 1992, at 10:00 a.m.